UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 21-CR-60253-MOORE/LOUIS

UNITED STATES OF AMERICA

v.

DEAN ZUSMER,

        Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

### I. INTRODUCTION

Defendant Dean Zusmer helped steal millions of dollars from Medicare. He should receive a significant custodial sentence. He paid marketing companies from overseas to run deceptive telemarketing campaigns targeting Medicare beneficiaries—the blind, elderly, and disabled. He lied on Medicare enrollment records. He executed sham contracts. He paid illegal kickbacks and bribes in exchange for doctor's orders for orthotic braces that no wanted or needed. He submitted false and fraudulent claims to Medicare. He used the money he stole from Medicare to supplement his already affluent lifestyle. And at trial, he took the witness stand and lied, repeatedly, in a vain attempt to escape responsibility for his crimes. He has shown no remorse—going so far as to call himself a victim on the stand. This Court should sentence him to **97 months in prison** (the bottom of the Guidelines sentencing range advocated by the government and within range set forth in the presentence investigation report ("PSR")), followed by three years of supervised release, and order restitution in the amount of $1,382,000 and forfeiture money judgment in the amount of $357,057.

### II. BACKGROUND

On January 30, 2023, after a nine-day trial, the jury convicted Defendant of Count 1 (conspiracy to commit health care fraud), Count 3 (health care fraud), Count 6 (conspiracy to pay

kickbacks), Count 9 (payment of illegal kickbacks), and Count 21 (filing false statements in health care matters); the jury acquitted him as to Counts 8 and 12 (payment of illegal kickbacks). (DE 358.)

In 2018, Defendant partnered with his close friend, codefendant Jeremy Waxman, in owning and operating Active Assist DME, Inc. ("Active Assist"), a durable medical equipment ("DME") company. (*See, e.g.*, GX 905A at 25; GX 905G at 16-17, 22, 34; GX 105B.) At that time, Waxman, through other DME companies, was engaged in a scheme to pay kickbacks in exchange for doctors' orders for DME and then use those orders to submit false and fraudulent claims to Medicare for DME that patients did not want, did not use, and did not need. (*See, e.g.*, D.E. 397 at 77, 90-91; D.E. 398 at 166-69, 176; D.E. 399 at 73; GX 29, 36, 42, 8.) The money was easy, and Waxman was enjoying the profits from the scheme. Defendant wanted a piece of the action. (*See, e.g.*, GX 905A at 1, 4, 7-10, 14, 16.)

Defendant and Waxman purchased Active Assist, a "front DME"—a DME that met Medicare's bare minimum requirements to obtain billing privileges. (*See, e.g.*, DE 397 at 275-76, 279.) As part of the scheme, Defendant agreed to conceal Waxman's ownership and managing control of Active Assist from Medicare—a necessary step to frustrate Medicare's ability to connect Active Assist with other DME companies involved in the scheme. (*See, e.g.*, D.E. 397 at 85, 88-89; D.E. 398 at 165-66.) On June 19, 2018, Defendant executed the Certification Statement CMS Form 855S falsely certifying that he (Dean Zusmer) was the sole owner and manager of Active Assist. (GX 105B.) It was a lie, and it mattered to the Medicare program. Had Medicare known Defendant was concealing Waxman's ownership and managing control, they could have (and likely would have) revoked billing privileges, suspended payments, reversed claims, and

ultimately, terminated Active Assist's enrollment and participation in the program. (*See, e.g.*, DE 395 at 275-76; *see also* GX 105B at 14-15.)

From there, Defendant, on behalf of Active Assist, executed sham contracts with "marketing" companies operating in the Philippines and other foreign countries. (D.E. 399 at 71-73; GX 505C, GX 505D.) But contrary to the language of the contracts, Active Assist was not purchasing marketing services, television advertisements, or brochures from these marketing companies. Instead, Defendant and his coconspirators were purchasing signed doctors' orders warranted to be reimbursable with Medicare. The contracts—as well as sham invoices issued—were generated in an effort to disguise the illegal nature of the arrangement and were drafted for one reason: to have on file if Medicare or law enforcement investigated the DME in an effort to make the DME appear legitimate. (*See, e.g.*, DE 399 at 50-51, 65, 95-96; DE 400 at 108-111; GX 836A; GX 837A.)

Throughout the scheme, Defendant—from his own personal account as well as an account in the name of Active Assist—paid kickbacks (by check) to these marketing companies for doctors' orders. (*See, e.g.*, D.E. 401 at 87, 211; GX 209B, 801, 825.) He was able to track these payments using: (i) the remittance advices (often referred to as "explanation of benefits" or "EOBs") from Medicare, (ii) the DME's bank statements, and (iii) the reconciliation reports provided by the marketing companies. (*See, e.g.*, GX 905G at 52, 54, 77-78, 97-98; GX 209, 1300, 1306A, 1308, 1308A, 1310, 1310A, 1318, 1318A, 1320, 1320A.) This reconciliation was necessary because Defendant and Waxman only paid for doctors' orders that resulted in successful claims submitted to Medicare. (*See, e.g.*, DE 399 at 43-45, 65, 104-105.) Therefore, when Medicare denied claims deriving from doctors' orders they purchased, Defendant and Waxman demanded—and often obtained—credits (in the form of additional doctors' orders). (*Id.*)

3

Defendant also was aware that Active Assist was submitting false and fraudulent claims to Medicare for DME—most notably, because the claims derived from overseas telemarketing campaigns and were procured through the payments of kickbacks and bribes to telemedicine doctors that had no relationship with the underlying patients. Indeed, ***none of the 1,380 Medicare Part B patients*** who received braces from Active Assist had a prior relationship with the provider who ordered the braces. (GX 26.) Additionally, the Medicare claims were patently fraudulent as hundreds of the patients received multiple braces—with some beneficiaries receiving as many as eight braces. (GX 29.) Specifically, from May 2018 through April 2019, Active Assist submitted 2,418 false and fraudulent claims to Medicare Part B totaling $2,353,480, of which Medicare paid $1,371,505. (GX 26.) And also submitted additional false and fraudulent claims to Medicare Advantage Plans administered by United Healthcare and Humana. (GX 102, 103D.)

Every claim that Defendant caused to be submitted, through Active Assist, to Medicare and Medicare Advantage Plans began as a phone call from an overseas telemarketer. (*See, e.g.*, D.E. 401 at 87, 211.) The company was a complete fraud. And he was undeterred along the way. He deliberately ignored red flags, including emails describing calls from patients and their family members complaining that his company was a "fraud," saying that they did not want or need the braces, and alleging that he was running a scam on the elderly. Instead, the company continued to bill and collect ill-gotten gains. (GX 612, 613, 1247, 1270.)

Defendant split the fraud proceeds with his partner, codefendant Waxman, and even partnered 50-50 with Waxman in purchasing a boat, which was poetically named "Brace Yourself." (GX 905T.) The conspirators would have kept on using Active Assist to fraudulently bill but for the law enforcement action Operation Brace Yourself (April 2019) and the resulting payment suspension issued to Active Assist.

At trial, Defendant took the stand and lied to the jury. He spun an elaborate tale claiming that he was completely unaware that he was paying illegal kickbacks and submitting false claims. It was incredible, the jury rejected it, and then convicted him of fraud, kickback, and false statement offenses. He is now scheduled for sentencing on April 20, 2023.

III.   ARGUMENT

The Court should calculate Defendant's Guidelines as follows:

| | |
|---|---|
| Base Offense level (§2B1.1) | 6 |
| Loss Amount (§2B1.1(b)(1)(I)) - more than $1.5 million and less than $3.5 million | +16 |
| Federal Health Care Offense (§2B1.1(b)(7)) more than $1 million | +2 |
| Mass Marketing (§2B1.1(a)(2)) | +2 |
| Sophisticated Means (§2B1.1.(b)(10)(C)) | +2 |
| Obstruction (§3C1.1) | +2 |
| TOTAL | 30 |
| | 97-121 mos. |

The PSR correctly calculates the loss amount and correctly applies the federal health care offense, mass marketing, and sophisticated means enhancements. However, the PSR failed to apply the 2-point obstruction enhancement (§ 3C1.1). Defendant objects to the loss calculation and the application of the mass marketing and obstruction enhancements and contends his Guidelines sentencing range is 57-71 months. For the reasons that follow, the Court should find that the proper Guidelines sentencing range is 97-121 months.

    i.   SENTENCING GUIDELINES CALCULATION

      a. The Loss Amount

Defendant also challenges the intended loss enhancement and argues that the commentary in Section 2B1.1(b)(1) creates an intended loss enhancement not included in the text of the

5

guideline. (*See* D.E. 429 at 2-3.)[1] However, the PSR properly calculated the loss amount, pursuant to Section 2B1.1(b)(1)(I), as the intended loss, $2,602,899,[2] the total amount Active Assist billed Medicare and Medicare Advantage Plans. This loss results in a 16-level increase to the Sentencing Guidelines calculation. Defendant objects to this calculation and contends that the loss should be the "actual loss"—the amount Medicare paid on the claims ($1,382,000)—resulting in only a 14-level increase. His argument has no merit.

To support his argument that the Court should use the "actual" rather than "intended" loss amount, Defendant cites to a Third Circuit case, *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). (D.E. 429 at 4-5.) First, *Banks* is not controlling in this Circuit and is contrary to Eleventh Circuit case law. The Eleventh Circuit has long interpreted loss in the context of Section 2B1.1 to include intended loss. *See, e.g.*, *United States v. Moran*, 778 F.3d 942, 973–74 (11th Cir. 2015); *United States v. Massam*, 751 F.3d 1229, 1232 (11th Cir. 2014); *United States v. Patterson*, 595 F.2d 1324, 1326–27 (11th Cir. 2010); *United States v. Willis*, 560 F.3d 1246, 1250 (11th Cir. 2009); *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291–92 (11th Cir. 2001); *United States v. Toussaint*, 84 F.3d 1406, 1407–08 (11th Cir. 1996). Courts have continued to apply intended loss after the ruling in *Banks*. *See, e.g.*, *United States v. Hernandez*, No. 22-10406, 2023 WL 309571, at *2 (11th Cir. Jan. 19, 2023); *Lantigua v. United States*, No. 3:16-CR-125-TJC-PDB, 2023 WL 2303050, at *13 (M.D. Fla. Mar. 1, 2023). The Court should reject Defendant's

---

[1] Defendant Zusmer's argument regarding loss substantially tracks Defendant Alexander's argument in his objections to the PSR. (D.E. 427.)
[2] The loss is calculated as set forth below:

| Program | Billed (intended) | Paid (actual) | Source |
|---|---|---|---|
| Medicare Part B | $2,353,480 | $1,349,306 | GX 101C |
| United Health | $160,297 | $14,868 | GX 102 |
| Humana | $89,122 | $17,826 | GX 87 |
| **TOTAL** | **$2,602,899** | **$1,382,000** | |

6

argument and apply a 16-level increase for loss.

Further, nothing in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)—the Supreme Court precedent upon which *Banks* relies—dictates that the term "loss" should be limited to "actual loss." Indeed, *Kisor* did not interpret the Sentencing Guidelines at all. In *Kisor*, the U.S. Supreme Court considered but rejected a challenge to *Auer*/*Seminole Rock* deference, a long-standing practice of deferring to agencies' reasonable readings of "genuinely ambiguous" regulations. *See* 139 S. Ct. at 2408. As the *Kisor* Court explained, first, "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415. Then, "[i]f genuine ambiguity remains," a court must ensure that "the agency's reading [is] reasonable," meaning that it "must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415-16 (quotations and citations omitted). Critically, *Kisor* did not purport to overrule the "long line of precedents" that rely on *Auer*/*Seminole Rock* deference, including *Stinson v. United States*, 508 U.S. 36 (1993), which considered the deference owed to the Guidelines' commentary. *See id.* at 2422. Indeed, *Kisor* expressly denied any intent to "cast doubt on many settled constructions of rules" and inject "instability into so many areas of law." *Id.* Indeed, as the Eleventh Circuit explained (post-*Banks*) in *United States v. Corker*, No. 22-10192, 2023 WL 1777195 (11th Cir. Feb. 6, 2023), *Stinson* and *Kisor* "govern how much deference to give to Guidelines commentary," not "whether binding precedent holds that Application Note 3(A) . . . [is] inconsistent with the Guidelines' text . . . ." *Id.* at *4 (upholding on plain error review the use of intended rather than actual loss).

About three years after *Kisor*, the Eleventh Circuit upheld the use of "intended loss" under Section 2B1.1(b)(1) in *United States v. Moss*, 34 F.4th 1176 (11th Cir. 2022). In so doing, the Eleventh Circuit "explicitly rejected the argument that Application Note 3(A) to § 2B1.1,

instructing courts to calculate 'the greater of actual loss or intended loss,' contradicts the plain meaning of the Guidelines' text." *Corker*, 2023 WL 1777195, at *4 (citing *Moss*, 34 F.4th at 1190)). In *Moss*, a defendant convicted of conspiracy to commit health fraud and several counts of health care fraud challenged the district court's determination that his loss amount was the amount billed to government insurance programs as opposed to what was actually paid. *Id.* at 1190. Defendant primarily argued that he had rebutted the presumption that his loss amount was the amount billed because he knew that the programs would not reimburse the full amounts he submitted. *Id.* at 1191. Affirming the district court's loss calculation, the Eleventh Circuit stated that even if the defendant adequately rebutted the presumption, the "pecuniary harm that the defendant *purposely sought* to inflict . . . includes intended pecuniary harm that would have been impossible or *unlikely* to occur." 34 F.4th at 1191 (quoting § 2B1.1 cmt. n.3(A)(ii)) (emphasis in original) (internal quotation marks omitted). The Eleventh Circuit went on to note that:

> [w]hat makes it unlikely the actual loss will be as high as the full amount of the fraudulent insurance claim is that the claim exceeds the insured value, and insurance companies rarely if ever slip up and pay the excessive amount. The hypothetical defendant in that commentary example knew it was 'unlikely' the claim would be paid in full, but he submitted the full amount anyway with the greedy hope that he would mistakenly be paid the full amount.

*Id.*

Defendant's reliance on *United States v. Dupree*, 25 F.4th 1341 (11th Cir. 2022), also is misplaced. (D.E. 429 at 2–3.) *Dupree* is distinguishable from this case in that it interprets different language in a different chapter of the Guidelines, and it provides no basis for discarding the definition of "loss." In fact, the reasoning in *Dupree* can be applied in support of the Guidelines' definition of "loss." In *Dupree*, the Eleventh Circuit held that the Guidelines commentary cannot "expand" the meaning of "unambiguous sentencing Guidelines." 25 F.4th 1341 at 1273, 1274–78.

Here, the natural reading of the term "loss" in context is that it covers what the Guidelines commentary says it does, and the term does not unambiguously exclude intended loss.

Accordingly, this Court has routinely sentenced health care fraud defendants—including Defendant's co-defendants—based on intended loss. This Court should reject Defendant's efforts to carve intended loss out of the definition of loss and find the total amount billed ($2,602,899) is the applicable loss amount.

### b. Federal Health Care Offense Enhancement

The PSR properly applied the federal health care offense enhancement in Section 2B1.1(b)(7). Defendant was convicted of a federal health care offense involving a government health care program (Medicare) and the loss was more than $1,000,000. As a result, a 2-point enhancement applies. Indeed, Defendant does not object to the application of this enhancement.

### c. Sophisticated Means

The PSR also properly applied the sophisticated means enhancement in Section 2B1.1(b)(10)(C) as the offense involved sophisticated means and Defendant intentionally engaged in or caused the conduct. This included executing sham contracts to disguise the illegal kickback arrangement, exchanging sham invoices, and concealing Waxman's involvement by filing false forms. Again, Defendant does not object to the application of this enhancement.

### d. Mass Marketing

The PSR also properly applied the mass-marketing enhancement in Section 2B1.1(b)(2)(A)(ii). The evidence presented at trial demonstrated that Defendant paid overseas call centers to conduct telemarketing campaigns as well as post internet click-bait ads to contact Medicare beneficiaries. (*See e.g.*, D.E. 397 at 108-09; D.E. 398 at 169-72; D.E. 399 at 10-11, 19-20; GX 1140, 1140A.) Once the beneficiaries were on the phone, the call centers would

"upsell" them, trying to convince them to accept multiple braces. (*See, e.g.*, D.E. 397 at 108-09; D.E. 398 at 171.) Indeed, Defendant testified that he was aware that he was paying for call centers to recruit Medicare beneficiaries. (*See, e.g.,* D.E. 401 at 211.)

"Mass-marketing" means a "plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to include a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit." U.S.S.G. § 2B1.1, Application Note 4(A). Defendant's scheme to defraud Medicare centered around telemarketing campaigns targeting Medicare beneficiaries. As a result of this mass-marketing campaign, in less than a year, Active Assist shipped over 2,400 braces to 1,380 beneficiaries, who were located all over the continental United States. This constitutes mass-marketing, and a 2-point enhancement should apply. *See Moran*, 778 F.3d at 976 (affirming the application of a mass-marketing enhancement in a Medicare fraud case involving the use of patient recruiters).

### e. Obstruction

The Guidelines calculation should include a 2-point enhancement, pursuant to §3C1.1, deriving from Defendant's perjured trial testimony. "A defendant is subject to enhancement of his sentence if he 'willfully obstructs or impedes, or attempts to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." *United States v. Williams*, 627 F.3d 839, 845 (11th Cir. 2010) (citing U.S.S.G. §3C1.1). "The enhancement is applicable if a defendant commits perjury." *Id*. (citing U.S.S.G. §3C1.1, cmt. N. 4(B)). To find obstruction, the Court must make "an independent factual finding that the defendant willfully lied in trial testimony." *United States v. Husky*, 924 F.2d 223, 224 (11th Cir. 1991). "Perjury occurs when a witness, testifying under oath, 'gives false testimony

10

concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Wallace*, 425 F. App'x 841, 842 (11th Cir. 2011) (citing *United States v. Dunnigan*, 507 U.S. 87, 94–95 (1993)). For Section 3C1.1 purposes, material matters are those that "if believed, would tend to influence or affect the issue under determination." U.S.S.G. §3C1.1, cmt. n.6.

Defendant proffered false testimony that went to right to heart of the elements of crimes of conviction.[3] *See United States v. Farley*, 607 F.3d 1294, 1336 n.27 (11th Cir. 2010) (observing that the record fully supported an obstruction enhancement because the defendant gave false testimony that went to an element of the offense); *Wallace*, 425 Fed. App'x at 842 (affirming application of two-level obstruction enhancement). He lied about not knowing what a doctor's order was. He lied about purchasing doctor's orders. He lied about his partnership with Waxman. He lied about his role at the DME company. He lied about the nature of payments he made to Waxman as well as to marketers. And, among other things, he lied about knowing that his DME was submitting fraudulent claims to Medicare. And the jury rejected his lies, credited other evidence, and convicted him of conspiracy to commit health care fraud, health care fraud, conspiracy to solicit and pay illegal kickbacks, payment of illegal kickbacks, and filing false statements. This perjured testimony was directly tied to the elements of these crimes, and, if believed, would have had a tendency to influence the jury's verdict. Therefore, the Court should apply the 2-point obstruction enhancement pursuant to §3C1.1.

    ii.    **SENTENCING RECOMMENDATION**

The Court should calculate Defendant's Guidelines range as 97-121 months. The government recommends a sentence of **97 months in prison**, followed by three years of supervised

---

[3] Attached as **Exhibit 1** are excerpts of some of Defendant's perjured testimony from D.E. 401 6–281.

release, and order restitution in the amount of $1,404,200 and forfeiture money judgment in the amount of $357,057. Defendant received $180,957 in direct payments from Active Assist to accounts he owned or controlled as well as $154,099 that was released to Defendant following an administrative action that seized the funds in the Active Assist account, totaling $335,057. Such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).[4]

*Nature and Circumstances of the Offense*. This was a fraud scheme that resulted in over $1.3 million in actual loss to the Medicare program. Over 1,300 patients' Medicare benefits were used to facilitate the scheme. Defendant paid overseas call centers to target vulnerable patient populations and then fraudulently billed Medicare for DME that patients did not want, did not need, or did not use. Defendant played a critical role in the scheme—he submitted false forms to Medicare, concealed his partner's involvement, executed sham contracts, and paid illegal kickbacks. This is a serious crime, and a Guidelines sentence is appropriate.

*Punishment, Promote Respect for the Law, and Afford Adequate Deterrence.* Health care fraud is rampant in the Southern District of Florida. Fraudsters, such as Defendant, steal funds from Medicare—which should have been used to pay for medically necessary items and services for the blind, elderly, and disabled. A Guidelines sentence to 97 months in prison promotes general deterrence and provides just and fair punishment. Also, such a sentence will promote respect for the law and will demonstrate that defendants like Defendant—those who are educated, are affluent, and come from considerable means—are punished equally under the law. *See United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (finding that the Guidelines offered "no special

---

[4] Even if the Court does not apply the obstruction enhancement (§3C1.1), resulting in a Guidelines range of 78-97, the government's recommendation remains unchanged: 97 months (the high-end of the Guidelines range) is appropriate as Defendant lied under oath.

12

sentencing discounts on account of economic or social status" and noted that "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are *more* rather than less culpable than their desperately poor and deprived brethren in crime."). Moreover, Defendant is a licensed medical professional (chiropractor). He knew better. In committing this crime, he abandoned his oath as a medical professional to help and heal people, and instead, sought only to make easy money at the expense of the taxpayer.

***Avoidance of Unwarranted Sentencing Disparity***. A Guidelines sentence to 97 months is also consistent with the sentences already issued to Defendants co-defendants (Jeremy Waxman and Ronald Davidovic). Both codefendants received Guidelines sentences after applying a 3-point reduction for acceptance of responsibility. Without acceptance, Waxman and Davidovic were subject to GSRs of 262–327 months and 87–108 months, respectively. The defendant's GSR of 97–121 months accurately reflects this level of culpability when compared to his codefendants.

| **Defendant** | **Sentence** | **Guidelines Range (w/o Acceptance/Cooperation)** |
|---|---|---|
| Jeremy Waxman | 188 months | Offense level 39 (262–327 months) <br> Loss Amount was between $25m and $65m <br> Role (leader/organizer) |
| Ronald Davidovic | 70 months | Offense level 29 (87-–108 months) <br> Loss amount between $3.5m and $9.5m |

## IV.  CONCLUSION

For all the reasons set forth above and the reasons articulated at the upcoming sentencing hearing, the Court should impose a sentence of **97 months in prison,** followed by three years of supervised release, and order restitution in the amount of $1,404,200 and forfeiture money judgment in the amount of $335,057.73.

Respectfully submitted,

GLENN S. LEON, CHIEF
FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

/s/ *Patrick J. Queenan*
CATHERINE WAGNER
(FL Special Bar No. A5502410)
PATRICK QUEENAN
(FL Special Bar No. A5502715)
MEREDITH HOUGH
(FL Special Bar No. A5502915; FL Bar No. 111553)
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
catherine.wagner@usdoj.gov
Patrick.queenan@usdoj.gov
meredith.hough@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 15, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ *Patrick J. Queenan*
Patrick J. Queenan
Trial Attorney